Good morning, your honors, and may it please the court. I'd like to begin, my name is Uli Guerra and I represent the petitioner. I'd like to reserve two minutes of my allotted time for rebuttal. This case is mainly about clear error review and whether the BIA correctly applied that standard in overturning the IJ's initial grants of CAT deferral. Now, the IJ in this case based her ruling on several predictive findings of facts. And under clear error review, the BIA could only overturn these findings if it found that they were illogical, implausible, or without support that may be drawn from the facts in the record. This is a highly deferential standard of review to the IJ's factual findings. In this case, the IJ found the petitioner's testimony regarding his tattoos and the threats that he received in prison to be credible. She also found credible the testimony the petitioner's mother gave regarding the threats she received about her son in 2014 on a visit to Honduras long before it was ever assured that her son would ever be paroled from state prison. In addition, the petitioner submitted testimony and evidence about a robbery that his brother suffered when he was soon after being deported to Honduras. In that robbery, the assailants specifically warned the petitioner's brother that they would top off the petitioner's head if he ever came back to Honduras. This was in 2014, and again, at that time, there was no assurance that the petitioner who was serving a life sentence would ever be released from state prison. However, in its decision overturning the IJ's grants, the BIA dismissed those threats as vague and speculative and offered no analysis beyond that. The BIA simply said that those threats were too remote and in time to establish a likelihood of torture. Under clear error review, if there are two permissible views of the evidence, the IJ is entrusted to make one determination, and the BIA owes that determination a high degree of deference because the IJ is to try a fact, the IJ is the person who listens to the testimony, was able to judge the credibility of the witnesses, and if the IJ makes a determination in favor of their credibility and in favor of those, or makes predictive findings of fact, those findings are owed a substantial deference, highly deferential. Council? Yes. What do we do with the board's observation that this former gang member apparently renunciated his gang ties while he was in state prison and yet was not harmed? My understanding is that these gangs follow a code of blood in, blood out, so one would expect that if he renounced his ties to the gang, he would have been attacked while he was in prison in the United States. Certainly, that's one view, and it was addressed at trial. Essentially, he was given a pass in the United States, but the petitioner's argument is that in Honduras, it's a different situation, and there is no renunciation. It truly is blood in, blood out, so. But doesn't that apply in the States as well? That's what I understood the board to be saying, that if that's the risk, the risk exists on both sides of the border. Correct, but clearly he wasn't harmed in the United States, and he was, at the very least, assured of a certain amount of safety in the United States that he wouldn't have had upon being deported to Honduras, because over there, the gangs observed that rule much more strictly than they otherwise would here in the United States. And again, that was- How do we know that? Well, that's something that the IJ considered. It would be a predictive fact that the IJ considered through testimony, through the documentary record. And the IJ, as a trier of fact, did make the determination that it was reasonably likely that he would be harmed in Honduras, even if he wasn't harmed in the United States. And when the IJ makes that determination, sorry. With respect, didn't the IJ make findings on that issue as to what the circumstances were in Honduras, that being that once they arrive, they go through a processing center and they're screened based upon their tattoos, and that there's zero tolerance for gang. Wasn't that the distinction made? Yes, that was another distinction made by the IJ that in Honduras, simply being in a gang is illegal. There's a law that criminalizes illicit association. And it's mentioned in the IJ's decision that Honduras was actually sued in the Inter-American Court of Human Rights about the abuses linked to that law. Honduras was ordered to change the law or to modify or repeal the law, and it has not done so. So- Okay, let's go about another question, which is the issue that was raised really collaterally on the issue of whether or not this case was moved. I'm aware of the Lynch case, but in that case, the petitioner had actually resisted deportation. Is the DHS policy still in effect that they facilitate the return of removed aliens? I'm not absolutely certain, Your Honor. I believe it might be. I don't know how that might be changed right now in the middle of the pandemic, but certainly it is possible that my client could be returned to the United States, pulled back into the United States should his case be remanded, should there be more proceedings associated with this case. Counsel, have you had recent contact with your client? Recent, not too recent. I spoke to the family. I haven't been able to speak to him directly. And- So as far as you know, no harm has befallen him since he was returned to Honduras? No direct harm. In the email that I received from the family, they did tell me that he is holed up in a house, not in their old neighborhood. He doesn't leave and that he is looking for ways to just avoid leaving the house. And he was considering applying for asylum in another country, but the pandemic, as far as I know, affected that. Okay. I think if it's remanded, this case is remanded, the facts that he hasn't been harmed, is it irrelevant for the IJ again? They would certainly be relevant, but it would also be relevant that he wasn't necessarily leading a normal life in Honduras. If he spent six or seven days out of the week just in a house, concealing himself, not being able to work, not being able to live a normal life, those are certainly issues that the IJ could consider in the likelihood of harm, because if he's purposely hiding his entire life, that's something that would be considered, that the IJ could consider in the proceedings that they came to. Moving on to my next point, the BIA also summarily dismissed the state action component of the petitioner's cat claim. The petitioner fears being arrested in Honduras soon after arriving because of his prominent gang tattoos. As I mentioned earlier, the evidence in the record shows, oh, I'm sorry, I see that my time is up. I'd like to reserve my remaining time for rebuttal. Okay. Ms. Brady? Yes, may it please the court, I'm Sue Earl Brady for the Attorney General. Petitioner's counsel correctly stated the issue, and that is whether substantial evidence supports the board's determination that it is not more likely than not that petitioner will be tortured in Honduras. The clearly erroneous standard was appropriately applied because the immigration judge's findings were predictive matters of fact. And the board determined that the immigration judge made a set of inferences that were not compelled by the evidence. And the inferences were that MS-13 gang members will murder petitioner, although as the court's question points out, he wasn't harmed in prison after he renounced his membership in MS-13, and that was back in 2006. And he clearly testified that he could have been harmed and the gang had the ability to harm him, but he was not harmed. And that is a substantial factor in determining whether or not it's predictive that MS-13 would harm him in Honduras. The second was that police- Council, this is Judge Tallman. We can't really consider that fact, can we? We have to confine our review to the record that was presented to the board at the time it ruled. So the question is whether or not the board labeling the IJ's findings as too speculative, as predictive, whether that's enough under the Hankson standard to support the board's ruling that the factual findings are clearly erroneous. Isn't that what we're focusing on? Yes, but if I understand your question, Your Honor, whether something occurred in the past would go to predicting whether that is going to occur in the future, because that's what the IJ assumed, that harm that had not befallen petitioner in the past would necessarily befall him in the future. That doesn't- Go ahead. Of what the IJ did and significant findings of fact based on credibility. And that was, he made clear that there is a processing program or that has been instituted in Honduras. So when they arrive at the centers, they look for tattoos. And if they find tattoos, then they're very concerned. And there's a zero tolerance as he found on gangs. So we have two different worlds and merely because he wasn't harmed in prison. And I don't know if you take additional notice that in prison, they often separate these people because they don't want anybody harmed, particularly after they take responsibility for that. But once he gets to Honduras and these findings were made by the IJ. And so why aren't they entitled to our consideration? Because the IJ did not and could not have made the finding that he necessarily would have been harmed by police in Honduras. We take the point that there is evidence that they have returning centers where individuals are scrutinized when they first arrived back in the country. But nothing said what happened to a person after he was so scrutinized. And it could be that the police identified him, saw that he had gang tattoos, but petitioner also said that he has evidence that he had renounced his gang. So there's nothing to say that that wasn't the factor. In fact, that he has not been detained in Honduras. So that was one of the linchpins of the immigration judges findings that he would be detained by police. Well, counsel, you keep referring to the fact that he was there, but- I'm not on appeal. I'm sorry, go on. Go ahead. We're not on appeal now. And the question is, before the IJ, is there a preponderance of evidence, essentially more probable than not? And in looking at all the circumstances, there is, you can't, or on appeal, the BIA didn't say, as a matter of judicial notice, these findings made by the IJ are not accurate. I don't see that anywhere in the BIA opinion. So the findings were they're processed, they look for tattoos, and that there is this level of corruption there. And as counsel has mentioned, even though they were ordered to resolve some of the gang problems, it hasn't been done in Honduras. Correct, but that background, it still goes to whether a prediction is more likely than not to occur. And there was no evidence that it was more likely than not that he would be detained, or that he would be harmed by police because he had a former gang membership. And those were the issues, I'm sorry. I understand what you're saying, but that was found. I think if you didn't have extensive findings by the IJ, I would take your position as true. But merely, and what else is the IJ supposed to do? If on appeal, the BIA said, no, there's no evidence whatsoever of that because we take judicial notice that that never occurs. That would be different. But the findings by the BIA were, they didn't get into that. They don't support anything. And I'd say their contrary position with anything that we can take account of, like judicial notice that that was inaccurate. But the issue of whether or not the immigration judge's findings were speculative would necessarily have to be taken into account in deciding whether or not they were predictive. Is that not correct? Perhaps I'm misunderstanding. But there was nothing to indicate that they were speculative. He made the findings as a matter of law. In other words, his findings were based on what he knew and what he found. And unless the BIA could come back and say, no, you can't make those findings because in fact, you take judicial notice that there isn't a processing center, they don't look for tattoos, and that there is zero tolerance for gangs. And that taking, and of course, that's taken into account with the facts, the credibility determinations that the IJ made at the time, giving credibility to Mr. Saucedo and also who did that. His mother. Yes, but they were testifying about, I'm sorry. No, go ahead and finish your answer to Judge Sower. They were testifying about things that had occurred in the past, such as the threats his mother and his brother received in 2014. So again, it would be going forward whether those past events mean necessarily that he would be harmed in the future. Go ahead. But if you're, what you're saying is that anything in the past cannot be considered. And I know you cited a case, but in that case, the facts, if they were old or stale was seven years, not three or four years old. So I think there's a distinguishing feature  Counsel, my concern is similar to Judge Sower's concern. Similar to Judge Silver's, it appeared to me that the board applied a label by declaring that these findings were clearly erroneous. But the question is, does the board have to articulate a stronger justification to apply that finding to, or that label to these findings? I wouldn't say that they have to apply a higher label, but it would just be whether or not the label or the finding itself is speculative. And that can be a matter of fact, if there's nothing to support it. And I think that's what the board was trying to indicate. Oh, maybe I can ask the question in a different way. Does the board have to articulate its reasons to support the label that the findings are speculative? I would imagine only if by labeling them speculative, the court couldn't review whether or not that was in fact correct. They basically said that, as I remember the BIA, that the IJ engaged in predictive fact finding, which was clearly erroneous. But the only thing they offered was that the facts were vague and remote. And they didn't say, and I'm returning to what I said, is that if they had offered something that we could take judicial notice of, for example, that the process, once he arrives in Honduras, is not accurate, that there isn't zero tolerance for gangs, that his tattoos wouldn't have given them evidence to indicate that he was a gang member. And I'm aware that he said that it's expensive to remove them, but he also said that even if they were removed, you can still see them. So that's my problem. I see what, I guess where I'm having trouble perhaps understanding is that in the cases determining whether or not an event were more likely than happened for cat protection, they do have to take facts into consideration in determining whether that's always going to be a predictive determination. And so the facts will never be hard and set that he has definitely already been tortured. That's rarely the case. So they will have to consider what the evidence was. In fact, petitioner had no evidence really of what happens to gang members once they're returned or deported to Honduras. Well, I thought that's what the testimony of Ms. Diaz was all about. Well, Ms. Diaz was accepted as an expert only in terms of human rights training of the police officers but she did not say that every gang member necessarily would be either detained by the police or that he will be tortured by the police. The evidence she gave about the disproportionate use of force by police seem to involve gang members who are armed or acting violently in particular neighborhoods in the country. And that that's where the police focus their efforts. But she could not- Is your argument that with regard to Ms. Diaz's testimony that while the IJ accepted her as an expert, she opined beyond the scope of her expertise? Is that what you're arguing? Well, she did insofar as the IJ made an explicit finding that he accepted her as an expert only in terms of human rights training of Honduran police. And there were several instances where she said she could not answer the question that was asked because it wasn't within her expertise. Are you saying though that there was no evidence to support the findings, the most important findings to me, the critical findings of the IJ were that the process when he arrives, there's a processing center he found, and that they look for tattoos, and that they have a zero tolerance for gangs, and that there's corruption and they have to overcome the corruption. And once they're in, they haven't rectified the problems in the jails where the gang members have been identified. I mean, I didn't see that in the BIA opinion that said there's no evidence of this. And if that's the case, then it would be clear error. But otherwise, it's really de novo review and not clear error. I take your point. I think where we still differ is on the issue whether or not a predictive finding that's speculative is necessarily has to be taken as correct. Because that's what we understood the board to be saying, that insofar as the predictive findings were inferences or speculative, that they could not credit them. All right, counsel, you've exceeded your time. Are there any other questions from the panel? No. Thank you very much. Counsel, for a comment, we'll add one minute to your time, your remaining time. Thank you, Your Honor. Just briefly, in closing, it's clear from the discussion that this case hinges on fact-finding. And in our system, the IJ is the person that's entitled to conduct that fact-finding. If the BIA wants to overturn the IJ's factual findings, the predictive findings, then they need to engage in clear error review. That is a standard that is highly deferential to the IJ. And it's a situation where the BIA has to explain its reasoning when the IJ makes a reasoned and clear decision for the BIA to engage with all of the points made by the IJ in order to overturn it. That clearly did not happen here. And for that reason, I submit that the BIA engaged in an over-review as opposed to clear error review. And with that, I submit. All right, counsel, thank you for your helpful arguments. This case will be submitted. Thank you, Your Honor. Thank you.
judges: Tallman, Silver, Hunsaker